DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

# OneView Contract Agreement
### Master Agreement # (Client #) _____



4776 28th Ave S
Fargo, ND 58104
Tel: (701) 293-9949   Fax: (701) 364-0298

**New Subscription (T&C attached)**
**Contract #** _____
**Quote Number:** _____
**Quote Name:** Quote for _____
**Client:** _____
**Quote Valid Until:** _____

| **Bill To** <br> FastTrac Transportation <br> **16220 Air Center Blvd.,** <br> **Houston, TX 77032** | **Sold To** <br> FastTrac Transportation <br> Drop ship to multiple locations <br> Each receiving location/DOT # will be invoiced separately |
|---|---|
| **Initial Term:** 36 Mo. <br> **Renewal Term:** 12 Mo. <br> **Auto Renew:** Yes | **Billing Method:** Both <br> **Payment Method:** ACH <br> **Payment Term:** Due Upon Receipt |

| PRODUCT | CHARGE | PERIOD | EFFECTIVE PRICE | QTY | TOTAL PRICE |
|---|---|---|---|---|---|
| Cab-Mate One (ELD Chrome) P-CM1-V-1022 & Fleet Manager w/ Diagnostics, Verizon LTE, OneView Saas, Forward facing camera P-DC-X-2029, 64GB SD card H-PRT-0-2025 & Suction, Cup or hard mount. If any units go into Canada an AT&T unit will be shipped | OnePrice | Month | $56.50 | 550 | $31,075.00 |
| Cab-Mate One (NO ELD) P-CM1-V-2026 & Fleet Manager w/ Diagnostics, Verizon LTE, OneView Saas, Forward facing camera P-DC-X-2029, 64GB SD card H-PRT-0-2025 & Suction,Cup or hard mount. If any units go into Canada, we will ship an AT& unit | OnePrice | Month | $46.50 | 100 | $4,650.00 |
| Advanced Implementation/Web training <br> SKU-PSIMP-ADV | Service | One Time | $3,500.00 | 1 | $3,500.00 |
| | | | Initial Upfront Charges* | | $3,500.00 |
| | | | Recurring Monthly Charges | | $35,725.00 |

*Client may add additional units at the pricing contained herein for a period of 180 days after contract effective date.*

**Special Provisions**

This quote is for the initial quantity of units listed above.. For additional units, a separate, signed quote(s) will be required. OnePrice includes: CabMate One Hardware Kit, Forward facing camera, 64GB SD card, suction, hard mount or cup mount, Monthly OneView Saas, speed by road, Maintenance Manager & Verizon data for OneView.  Implementation/Training cost of $3,500 covers all set up and web training throughout rollout.  If FastTrac decides to add additional outside applications to the Android tablet additional data rates will apply. Price to be determined once Pedigree tests the application. If FastTrac decides to add Turn by Turn Navigation or Jobs with route Integration there will be an additional $3 each per truck per application fee added to the monthly dues.  Integration work with Omni dispatch will be determined at the time of the scope of work.

Client Initials DR

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

\* Unless otherwise provided in the pricing above, installation services, shipping and handling, training services, travel and other related expenses are not included, and such items, if provided by Pedigree, are to be priced and invoiced separately from Pedigree to Client.  See **Exhibit A – Implementation Plan**.

Purchased Hardware will be invoiced to Client upon shipment, pursuant to **Exhibit A – Implementation Plan**, and will be due upon receipt of invoice by Client.

Ongoing support (and other services) information and elections are included in the attached **Exhibit B – Support and Services**.

Recurring Monthly charges shall be invoiced monthly beginning with the Term Start Date (see Section 1.15 Term Start Date).

By executing this OneView Contract Agreement for the provision and acquisition of products and services, the undersigned Parties agree to abide by the contractual terms and conditions contained in that certain Pedigree Technologies, LLC Master Agreement-Terms and Conditions (the "T&C") and incorporated herein by reference.

The undersigned acknowledge and agree that this OneView Contract Agreement, the T&C and any exhibits, addenda, amendments or supplements thereto - entered into by and between the Parties from time to time - together comprise the "Master Agreement" between the Parties and that the provision of products and services by Pedigree Technologies, LLC under this OneView Contract Agreement, and the rights and obligations of the undersigned Client and Pedigree Technologies, LLC, are subject to all of the terms and conditions contained in said Master Agreement.

**IN WITNESS WHEREOF,** Client and Pedigree have caused this Agreement to be duly executed by their respective authorized representatives as noted below, as of the Effective Date of _____
(Contract Effective Date)

| **FastTrac Transportation** | **PEDIGREE TECHNOLOGIES, LLC** |
|---|---|
| By: _David Robertson_ (DocuSigned by: 901313687BDE4AC...) | By: _____ |
| (Signature) | (Signature) |
| Name: David Robertson | Name: _____ |
| (Print or Type) | (Print or Type) |
| Title: VP of Safety and Regulations | Title: _____ |

Client Initials  _DR_

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

Pedigree Technologies, LLC
MASTER AGREEMENT –TERMS AND CONDITIONS

Master Agreement No. _____

THIS MASTER AGREEMENT TERMS AND CONDITIONS ("T&C") contains the terms and conditions governing the purchase of products and services from Pedigree Technologies, LLC and is entered into as of the date set forth in the OneView Contract Agreement by and between Pedigree Technologies ("Pedigree"), 4776 28th Ave S, Fargo, North Dakota 58104, and  ("Client"), which incorporates this T&C by specific reference.  The OneView Contract Agreement and this T&C (and any addenda, amendments or supplements entered into by and between the Parties from time to time) together constitute the "Master Agreement" between Pedigree and Client.

**1      Definitions.**

1.1     **Authorized End User** shall mean any individual employee or contractor of Client accessing or using the Hosted Applications solely for the benefit of Client.

1.2     **Client Information** shall mean all Client data transmitted over the Communications Network and Hardware and/or stored in Hosted Applications.

1.3     **Client Marks** shall mean all Client-owned logos, trademarks, and domain names.

1.4     **Communications Networks** shall mean the third party networks (cellular and/or satellite) through which the Hardware is connected to utilize the Hosted Applications provided by Pedigree.

1.5     **Confidential Information** shall include all written or oral information, disclosed by either Party to the other, concerning or related to the operations of either Party (or otherwise identified as confidential information by the disclosing Party). It shall also include any third party disclosures that have been clearly identified as confidential, as well as disclosures which, by the nature of the circumstances surrounding such disclosure, ought reasonably to be viewed and treated as confidential and specifically includes information regarding the pricing and other terms and conditions upon which Pedigree provides its products and services.

1.6     **Good Working Order** shall mean Hardware that meets Pedigree specifications stated in the Master Agreement or as provided in user documentation.

1.7     **Hardware** shall mean the Pedigree-provided devices and any ancillary accessories necessary to connect to and communicate with Pedigree's Hosted Applications.

1.8     **Hosted Application(s)** shall mean (i) the ability to access features and functions of the software application(s) and any and all other hosted content made available by Pedigree to Client and/or (ii) a data feed made available to Client.

1.9     **Licensed Technology** shall mean collectively the software, if any, embedded within Hardware, and Hosted Applications to which the Client is provided access based upon the terms of the Master Agreement with Pedigree.

1.10    **MASTER AGREEMENT** shall mean collectively those certain agreements between the Parties comprised of: the OneView Contract Agreement, to which this T&C is attached; this T&C; and any addenda, amendments or supplements thereto entered into by and between the Parties from time to time. The Master Agreement shall define and control the business relationship of the Parties as it pertains to the subject matter of these documents.  The Master Agreement is sometimes referred to in this T&C, and may be referred to in a OneView Contract Agreement, as "this Agreement" or "the Agreement."

1.11    **OneView Contract Agreement** shall mean those certain agreements, executed by the Parties from time to time and specifying the specific products and services to be acquired by Client from Pedigree, whether by new subscription or by addendum.  Any such OneView Contract Agreement shall be in substantially the form of the OneView Contract Agreement to which this T&C is attached, and Client's purchase of specific products and services from Pedigree pursuant to any future such OneView Contract Agreement shall be subject to the terms and conditions contained in this T&C.

1.12    **Party or Parties** means individually or collectively, as the case may be, Pedigree and Client and any and all permitted successors and assigns**.**

1.13    **Pedigree Marks** shall mean all Pedigree-owned logos, trademarks and domain names.

1.14    **Term** shall mean the period during which Client recieves services from Pedigree as specified in the OneView Contract Agreement, subject to, and as modified by, the provisions of Section 8 of this T&C.

1.15 **Term Start Date**, unless otherwise provided by Exhibit A – Implementation Plan, shall mean the earlier of (i) 30 days after the date Hardware is shipped from Pedigree to Client pursuant to the Master Agreement, or (ii) the date all hardware has been installed.

2       Access Grants, Software licenses and Terms of Use.

2.1     **Provision and Access**. Subject to the terms and conditions contained herein, Pedigree agrees to provide access to the features and functions of the Hosted Application and Communication Network during the Term solely for use by Authorized End Users. Pedigree shall provide to Client the necessary passwords and internet addresses to allow Client to access the Hosted Application.

2.2     **Access Grant**; **Licensed Technology License**. Subject to the terms and conditions contained herein, and including the payment of the applicable fees, Pedigree grants Client  a limited, non-transferable, non-sublicenseable, non-exclusive, royalty-free right and license to use the Licensed Technology in a fully assembled state solely for Client's own internal business use. Client shall not copy, reproduce, modify, or attempt to reverse engineer, decompile, disassemble, reverse translate or in any manner decode the object code of any Licensed Technology in order to derive, obtain or perceive the source code from which any component thereof is compiled or interpreted.  Client acknowledges that nothing in this Agreement will be construed to grant Client the right or ability to (i) any intellectual property, (ii) modify the Licensed Technology or create any derivative product from any of the foregoing, (iii) obtain or use such source code; or (iv) assign, sublicense, sell, resell, lease, rent or otherwise transfer or convey, or pledge as security or otherwise encumber, Client's rights granted herein to the Licensed Technology. Client will not, without Pedigree's express written consent, use, duplicate or disclose any technical data or any information on the construction of the Licensed Technology for any purposes other than for the installation, operation or maintenance thereof.  Client will ensure that its use of the Licensed Technology complies with all applicable laws, statutes, regulations or rules promulgated by governing authorities having jurisdiction over the Parties and/or the Licensed Technology.

2.3     **Pedigree Retained Rights; Ownership.** Subject to the rights granted in this Agreement, Pedigree and its third party vendors retain all right, title and interest in and to the Licensed Technology and its related intellectual property rights, and the Pedigree Marks. Client acknowledges that it neither owns nor acquires any additional rights in and to the foregoing not expressly granted by this Agreement.  Client further acknowledges that Pedigree retains the right to use the foregoing for any purpose in Pedigree's sole discretion.

2.4     **Client Retained Rights; Ownership**. Pedigree grants to Client the right to use the Hardware together with the software embedded in the Hardware for the term of this Agreement.  Client may only use Hardware within the continental United States, its coastal waters, and Canada. In addition, Client retains all right, title and interest in and to Client Marks and Client Information, and Pedigree acknowledges that it neither owns nor acquires any additional rights in and to the foregoing

Client Initials ____

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

than the rights expressly granted by this Agreement, including rights granted to Pedigree pursuant to Section 11.1 of this T&C.  Client grants to Pedigree a non-exclusive, royalty-free right and license in all Client's Information and Client Marks, but only for the following purposes: (i) to perform the services, internal testing and continued product development contemplated under this Agreement; (ii) to disclose in verbal or written form, in an anonymous summary format with other client data that does not directly identify the Client nor its customers to be used for Pedigree business planning, traffic forecasting and patterns and other management and analytical needs; and (iii) for Pedigree's use as permitted by Section 11.1 of this T&C.

2.5   **Authorized End User Access to the Hosted Application.** Client may permit an Authorized End User to use the Hosted Application. Client will ensure that any such Authorized End User will be bound by an enforceable contractual agreement which shall by its terms provide substantially the same or greater protection for Pedigree's Confidential Information, the Licensed Technology, documentation, and/or user guides as are provided by the terms contained herein**.** Client acknowledges and agrees that, Client shall be responsible for all acts and omissions of Authorized End Users, and any act or omission by an Authorized End User, that if undertaken by Clients would constitute a breach of this Agreement, shall be deemed a breach of this Agreement by Client.

2.6   **Development Services.** Unless separately agreed by the Parties, Pedigree shall own all right, title and interest in and to any deliverables developed by Pedigree.

3     **Licensed Technology Terms of Use; Performance.**

3.1   **Performance.** Pedigree's duties and responsibilities contained herein shall be performed by Pedigree and/or its assignees, agents and/or subcontractors.

3.2   **Coverage and Data Transmission:** The access and use of the Communication Network, Global Position System ("GPS") network, and the Internet are dependent on the coverage and calling areas of networks owned by, operated by, and under sole control of third parties, and are made available to Client, subject to availability, over which Pedigree assumes no control. Client acknowledges that Pedigree is not responsible for limits in Communication Network coverage, loss of GPS signal or internet accessibility, due to (i) environment variables or performance degradation; (ii) due to any actions of third-parties outside the control of Pedigree; or (iii) transmissions from Hardware antennae that have an obstructed view of the sky, are in enclosed spaces, in buildings, between tall buildings, underground or in canyons or similar line of sight obstructions.

3.3   **Client acknowledgements.** Client acknowledges that (i) Client Information collected by the Hardware while out of coverage, without access to the Communication Networks, or outside a reporting interval may not be able to be stored and retrieved by Client when coverage or calling connectivity is restored; (ii) Client Information may not be in real time and delays in receipt of data are normal; (iii) data collected by Hosted Applications will be stored on a Pedigree server for ninety (90) days which data, after such ninety (90) days, may be archived or purged at Pedigree's sole discretion; and (iv) Client assumes the entire risk in downloading or otherwise accessing any data, information, files or other materials obtained from the Pedigree's business support network or any Hosted Applications; (v) Hosted Applications, which provide location or directional information are to be used only as an aid in planning, as with any maps or driving directions, Client should always recheck directions and driving conditions for accuracy and confirm that the road still exists, be aware of construction and other hazards and follow all safety precautions and the law; and (vi) due to the factors described in this Agreement and Section 3.3, the Client Information and data transmitted through Hardware may not get to its intended destination in real time and Client should plan accordingly.  Client acknowledges and agrees that the amounts due to Pedigree for services provided pursuant to any OneView Contract Agreement and the Master Agreement are not subject to reduction, abatement or setoff due to any interruption in service, access or use arising from or associated with any circumstances described in this Section 3.

3.4   **Access Limit.**  Pedigree reserves the right, as required and without advance notice to Client, to control, restrict, and/or disable Clients' hardware communication over the Communication Network to prevent any negative impact to other Clients and/or the Hosted Application.

4     **Fees and Other Charges**.

4.1   **Fees**. During the term of this Agreement, Client agrees to compensate Pedigree as set forth in (i) any OneView Contract Agreement that is executed by the Parties as a part of the Master Agreement and (ii) this T&C, including Section 4.8 hereof.  All fees and charges are in U.S. dollars. Fees are subject to change and may be adjusted prior to the execution of a OneView Contract Agreement, or after the end of a then current Term. Client may not abate, reduce, or set-off any amounts due under any Pedigree invoice other than as provided for under Section 4.7, but shall pay any such amounts to Pedigree in full when due and shall only seek a refund or return of amounts paid pursuant to the procedures for disputed charges set forth in Section 4.7 hereof.

4.2   **Monthly Client Fees.** Monthly Client Fees shall include all fees due for Communication Network, Hosted Applications and Pedigree financed Hardware as applicable and as set forth in the OneView Contract Agreement.  Client shall pay the Monthly Client Fees for each Hardware unit, regardless of activation date, to be activated on the Communications Network or Hosted Application specified in the applicable OneView Contract Agreement, beginning on the Term Start Date.

4.3   **Termination Fee.** Should t**h**is Agreement be terminated or a Hardware unit deactivated prior to when a Hardware unit has completed an individual term as specified in the OneView Contract Agreement, Client shall pay a termination fee equal to the applicable Monthly Client Fees due for the remainder of the OneView Contract Agreement period, as either applies to the terminated Agreement or to the deactivated Hardware unit(s) (as the case may be).

4.4   **Other Fees and Charges.**  Pedigree reserves the right to charge for additional services requested by Client outside the scope of this Master Agreement and then existing OneView Contract Agreements, including but not limited to: development services; professional services; Hosted Application data recovery; on-site training; on-site hardware install, repair, servicing, or activation; invoicing to multiple sites; shipment expediting or shipping to multiple locations; or custom reporting.  Charges for such services shall be negotiated between the Parties and evidenced in writing. Pedigree has no obligation to provide any such services absent a written agreement.

4.5   **Taxes**. All prices and rates on the Schedule(s) of Charges to be provided under this Agreement do not include sales, use, excise, GST, Universal Service Charge or other transactional taxes (**"Taxes"**). These taxes may be included in charges detailed on Pedigree's invoice to Client unless Client provides Pedigree with a tax exemption certificate annually that is acceptable to applicable taxing authorities. Client will hold Pedigree harmless from all claims and liability arising from Client's failure to support or pay any such taxes, including but not limited to duties, tariffs or charges.

4.6   **Invoices.** Unless otherwise provided in the OneView Contract Agreement, Client agrees to make payment in full of all undisputed charges not later than thirty (30) days after the invoice date ("Due Date"). Overdue payments may, at Pedigree's sole discretion, be subject to late charges, in an amount equal to 1.5% of the amount then due for each month, or portion thereof, that said overdue payments are not made (or such lesser rate as may be the maximum permissible rate under applicable law), and compounded monthly. In addition, Pedigree may also suspend Client's access to the Hosted Application and Communication Network, with five (5) days written notice, and/or suspend any Hardware shipments if Client has not made payment in full by the Due Date. Client shall also reimburse Pedigree for Pedigree's reasonable collection and litigation expenses, including attorney's fees, incurred by Pedigree to collect any late payment and Client shall be required to pay a reinstatement fee of $25 per Hardware device to reactive any suspended access to the Hosted Application and/or Communication Network.   Pedigree shall send all invoices to Client as directed in the applicable OneView Contract Agreement.

4.7   **Disputed Charges**. CLIENT ACKNOWLEDGES AND AGREES THAT ANY CLAIMS IT MAY HAVE AGAINST PEDIGREE UNDER THE TERMS OF AGREEMENT SHALL BE MADE SOLELY AGIANST PEDIGREE AND NOT ANY ASSIGNEE OF PEDIGREE, NOTWITHSTANING ANY CREDITS, OFFSET RIGHTS, OR CANCELLATION RIGHTS THAT MAY BE PROVIDED FOR HEREIN UNDER THIS AGREEMENT.  In the event Client, in good faith, disputes any charges stated in a Pedigree invoice, such dispute shall not relieve Client's obligation to make such payment.  However Client may seek reimbursement from Pedigree for all or a portion of any invoice in dispute in the manner provided for herein, provided that, within fifteen (15) days of receipt of such invoice, Client (i) notifies Pedigree in writing of the disputed charges, specifying in detail the disputed amount(s), the specific Client details pertaining to the disputed amounts and the basis of the dispute; (ii) pay all invoiced amounts; and (iii) uses all reasonable efforts to promptly resolve the dispute. Pedigree shall have sixty (60) days from the

Client Initials  _DR_

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

date of Client's notification hereunder to provide Client with Pedigree's response in connection with a disputed item. If the Client fails to provide Pedigree with such written notice of the dispute within fifteen (15) days of the invoice date, then Pedigree shall have no obligation to investigate or reimburse any paid invoices to Client and the Client waives any rights to dispute such charges and such pay all amounts specified in the applicable invoice by the due date specified in such invoice, without any abatement, reduction or set-off. If any such dispute remains unsettled after sixty (60) days, the Parties agree to submit such dispute to a mutually acceptable Registered Mediator located in the State of North Dakota with the mediation to be conducted in person or telephonically, and conduct good faith pre-suit mediation prior to filing a complaint in any court.  Client's only recourse is to seek indemnification from Pedigree for the amount of such disputed claims and reimbursement for any paid invoiced amounts.

4.8  **Client Credit**. Client acknowledges and agrees that Client must satisfy Pedigree's credit criteria then in effect, from time to time, to receive continued access to the Licensed Technology, if Client allows any payment to Pedigree to be overdue by more than sixty (60) calendar days.

4.9  **Additional Purchases**. Unless otherwise agreed in writing, client shall execute an additional OneView Contract Agreement (Addendum) for all subsequent purchases of Hardware and/or Services, including any component of the Licensed Technology. Once a OneView Contract Agreement has been executed by Client and accepted by Pedigree, such OneView Contract Agreement is considered firm and cannot be cancelled or changed by Client without Pedigree's written consent.

**5    HARDWARE Delivery, Maintenance and Repair.**

5.1  **Point of Delivery.**  All Hardware purchased by Client from Pedigree is shipped freight on board (FOB) from a Pedigree-designated warehouse facility. Pedigree shall arrange and pay for the shipping and handling, but such charges shall be billable to Client, unless otherwise provided in the OneView Contract Agreement, of such Hardware from its warehouse to the shipping address specified in the OneView Contract Agreement.  Client shall be responsible for insurance and bear all risk of loss for such Hardware upon delivery to Client's shipping address.

5.2  **Hardware Installation**. Client shall be solely responsible for (i) the installation of Hardware, unless Installation Services are purchased from Pedigree and included in the OneView Contract Agreement; and (ii) for all integration with any hardware and/or software applications not purchased from Pedigree. "Installation" shall mean attachment of Hardware and its related accessories, if required to the Client's vehicle or other asset.  If Installation is purchased from Pedigree, the Parties shall each make commercially reasonable efforts to schedule and complete Installation within thirty (30) days of receipt of Hardware by Client. Purchased installation services will be provided by Pedigree Employees or Certified 3rd Party Installation Vendors.  Standard Installation hours are between 7:00 a.m. and 6:00 p.m., Monday through Friday, Client's local time. Client shall be charged $75 per vehicle for each vehicle that was scheduled for installation but was not available within fifteen (15) minutes of the scheduled installation time or if the installation scheduled time is changed by Client less than twenty-four (24) hours prior to such scheduled installation. Client also agrees to provide a reasonably safe work environment at the installation site. Client acknowledges that, in connection with the installation, Pedigree may modify or alter, including without limitation drill holes, cut panels and body or rewire Client's vehicles or other assets. Pedigree will not be responsible for, and makes no assurances regarding, the restoration of Client's vehicles to their unmodified or unaltered condition.

5.3  **Hardware Warranty**.  Pedigree shall provide a limited warranty on new Hardware provided to the Client by Pedigree, for a Warranty Period of one (1) year from date of Shipment to Client's shipping address.  During the Warranty Period, the Hardware shall be repaired by Pedigree (or its third party vendor) due to issues related to materially defective materials, materially faulty workmanship, or incapability of connecting to Communications Networks. These obligations shall not apply to: (i) hardware normally consumed in operation such as fuses, cables, antennae or mounting brackets; or (ii) defects which, due to no fault of Pedigree, are the result of: (a) Client's unauthorized or improper use of the Hardware (improper operation and/or use with other equipment); (b) detrimental exposure to weather, water, and/or fire; (c) involvement in any accident, explosion, or Act of God; (d) tampering, alteration or repair by any party other than Pedigree or its authorized installers without Pedigree's prior written consent; or (e) broken seal, improper storage, installation or implementation, alteration to external antenna by Client.

5.4  **Return Authorization**. Pedigree shall perform maintenance after proper notification by Client that any Hardware purchased from Pedigree is not in Good Working Order.  Proper notification will be deemed to have occurred only after (i) Client has worked with Pedigree's customer support team to evaluate, troubleshoot and test any unit that does not appear to be in Good Working Order; (ii) Pedigree's customer support team determines that the Hardware cannot be repaired over the phone or over the air, and Client is  assigned a Return Material Authorization Number ("**RMA**"); and (iii) Client de-installs and returns the failed Hardware to a Pedigree-designated facility for repair.  Client shall be responsible for all costs associated with the de-installation of the Hardware deemed not to be in Good Working Order, including shipping costs to Pedigree's facility, and all risk of loss in transit to and from Client's location. The assigned RMA shall be clearly visible on each shipping form and associated shipping carton; and (iv) Client shall be responsible for the installation of the repaired or replacement Hardware.

5.5  **Under Warranty Repairs**. Pedigree shall return the Hardware, or new or reconditioned Hardware, at Pedigree's option, free of charge to Client via best way ground, unless otherwise specified by Client (with additional costs thereof to Client's account).  Pedigree's obligation is limited to restoring the Hardware to Good Working Order.  Should Client send Hardware to be repaired under this Section 5 that is not covered by the Warranty Period or was in Good Working Order when received, Client shall be charged for Non-Warranty repairs and costs of return shipment.

5.6  **Non-Warranty Repairs**. Upon issuance by the Client of a purchase order including return shipping costs, all work performed on Hardware outside the Warranty provisions of this Agreement shall be done on a time and materials basis, with the hourly rate for non-Warranty repairs to be $150.00.  Notwithstanding the foregoing, Hardware sent in for repair for which no problem was found shall be charged at a rate of $150.00. Retail price will be charged for any Hardware replaced that is not covered under standard Warranty terms. Pedigree may, in its sole discretion, replace defective Hardware with new or used comparable Hardware manufactured by the same or other manufacturers.

**6    SUPPORT.**

6.1  **Support**. Pedigree's Licensed Technology support is available by telephone or e-mail Monday through Friday, from 7:00AM to 6:00PM (Central). E-mail or voice-messages received outside of these business hours shall be responded to within the next business day.

6.2  **File Security.**  Client acknowledges that it is technically possible for third parties to monitor data traffic over the air via the Communication Networks.  If Client desires to secure its transmissions, Client will be solely responsible for providing encryption and security for its data.

6.3  **Hosted Applications.**  Pedigree will, at its own expense, provide for the hosting of Hosted Applications and if applicable, Communications Networks. Pedigree may enter into an arrangement with one or more third parties for the performance of Pedigree's obligations under this Agreement. During the Term, Client shall receive support, upgrades, revisions, enhancements and extensions to the extent provided by Pedigree or its third-party vendors for the Licensed Technology.

**7    TERM**.

7.1  **Effective Date and Term**. Unless terminated earlier as provided below, the Master Agreement will become effective on the Effective Date as provided in the OneView Contract Agreement (and any applicable Addendums), and will continue in effect for the period stated in the OneView Contract Agreement (normally thirty-six (36) months) from the Term Start Date (the "Initial Term").  Thereafter, unless otherwise provided in the OneView Contract Agreement, the Master Agreement will automatically be renewed for successive twelve (12)-month terms unless either Party gives written notice of intent not to renew the Agreement at least ninety (90) days prior to the end of the then current term.

7.2  **Termination for Breach**.  Either Party may terminate this Agreement if the other Party breaches any of its material obligations under this Agreement and fails to cure such breach within thirty (30) days of written notice thereof. In addition, either Party may terminate this Agreement following the other Party's failure to cure any of the following, within five (5) days of written notice thereof, upon: (a) the other Party's provision of a materially false statement or representation; (b) the other

Client Initials _DR_

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

Party's insolvency, (c) the other Party's failure to pay debts as they come due; (d) assignment of the other Party's business entity for the benefit of creditors; (e) the other Party's application for or consent to the appointment of a custodian, receiver or trustee for the other Party's or a substantial part of such Party's property or business; or (f) the other Party's institution of bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors by or against such Party. In addition, Pedigree may terminate the Master Agreement if Client breaches any of its payment obligations to Pedigree and has not cured such breach within five (5) days written notice of such failure to make a required payment. (Each of the foregoing is referred to and shall be deemed a "Default" for all purposes of the Master Agreement. Notwithstanding Client's rights of termination, it shall remain bound by the terms and provisions of Section 7.3 herein.

7.3   Client's obligation to make payments provided for in this Agreement and all of its other obligations herein are absolute and unconditional and are not subject to any abatement, set-off, defense or counterclaim for any reason whatsoever. Notwithstanding the foregoing, Client may seek reimbursement or indemnification from Pedigree for any good faith claim it makes against Pedigree on account of a material breach of the terms of this Agreement by Pedigree.

7.4   **Return of Equipment and Materials Upon Termination.** Upon termination of this Agreement, Client shall immediately return Pedigree's Confidential Information Materials to Pedigree. In the case of Pedigree financed Equipment (ONEPRICE, Lease, etc.), Client may retain the delivered and/or installed Equipment, subject, of course, to payment of the Termination Fee. Until the termination fee is paid, however, the Pedigree financed equipment remains as collateral for the financing, and as such may not be retained, sold, transferred, destroyed, or otherwise disposed of without Pedigree's express written consent.

8   **DISCLAIMERS, EXCLUSIONS AND LIMITATION OF LIABILITY.**

8.1   **DISCLAIMER.** EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE HARDWARE, THE LICENSED TECHNOLOGY AND ANY OTHER MATERIALS, SOFTWARE, DATA AND/OR SERVICES PROVIDED BY PEDIGREE ARE PROVIDED "AS IS" AND "WITH ALL FAULTS," AND PEDIGREE EXPRESSLY DISCLAIMS ANY AND ALL OTHER PROMISES, REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, NON-INTERFERENCE, VALUE OR ACCURACY OF DATA, AS WELL AS ANY WARRANTIES OF MERCHANTABILITY, SYSTEM INTEGRATION, FITNESS FOR A PARTICULAR PURPOSE, FITNESS FOR USE FOR LIFE SUPPORT OR EMERGENCY SITUATIONS OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT. NO WARRANTY IS MADE BY PEDIGREE ON THE BASIS OF TRADE USAGE, COURSE OF DEALING OR COURSE OF PERFORMANCE. PEDIGREE DOES NOT WARRANT THAT THE LICENSED TECHNOLOGY OR ANY OTHER INFORMATION, MATERIALS, TECHNOLOGY OR SERVICES PROVIDED UNDER THIS AGREEMENT WILL MEET CLIENT'S REQUIREMENTS OR THAT THE OPERATION THEREOF WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT ALL ERRORS WILL BE CORRECTED. CLIENT ACKNOWLEDGES THAT PEDIGREE'S OBLIGATIONS UNDER THIS AGREEMENT ARE FOR THE BENEFIT OF CLIENT ONLY.

8.2   **PEDIGREE LIMITATIONS OF LIABILITY.** EXCEPT WITH RESPECT TO ITS OBLIGATIONS UNDER SECTION 10.1 AND 11, IN NO EVENT SHALL PEDIGREE BE LIABLE FOR AND CLIENT HEREBY WAIVES ITS RIGHT TO CLAIM, ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS) DIRECTLY OR INDIRECTLY RELATING TO OR ARISING OUT OF PEDIGREE'S BREACH OF THIS AGREEMENT OR CLIENT'S INABILITY TO USE THE LICENSED TECHNOLOGY OR ANY PART THEREOF, EITHER SEPARATELY OR IN COMBINATION WITH ANY OTHER COMMUNICATIONS FACILITIES OR IN CONNECTION WITH ANY SERVICES, PERFORMED OR NOT PERFORMED BY PEDIGREE UNDER THIS AGREEMENT, OR FOR ANY OR ALL LOSS OR DAMAGE DIRECTLY OR INDIRECTLY RELATING TO OR ARISING OUT OF A THIRD PARTY'S UNAUTHORIZED ACCESS TO CLIENT'S DATA TRANSMITTED REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), EQUITY, STRICT LIABILITY OR OTHERWISE, AND WHETHER OR NOT SUCH DAMAGES WERE FORESEEN OR UNFORESEEN, EVEN IF PEDIGREE HAS BEEN ADVISED OF THE POSSIBILITY THEREOF. PEDIGREE'S MAXIMUM AND SOLE LIABILITY TO CLIENT FOR SERVICES HEREUNDER, SHALL BE LIMITED TO CLIENT'S DIRECT DAMAGES, WHICH SHALL IN NO EVENT EXCEED THE AMOUNT EARNED PAID TO PEDIGREE BY CLIENT UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING CLIENT'S WRITTEN NOTICE OF PEDIGREE'S BREACH OF THIS AGREEMENT. THE ENTIRE LIABILITY OF PEDIGREE AND THE EXCLUSIVE REMEDY OF CLIENT SHALL BE REPAIR OR REPLACEMENT OF THE HARDWARE, DURING THE MAINTENANCE PERIOD IF SUCH HARDWARE DOES NOT MEET THE GOOD WORKING CONDITIONS SET FORTH IN THIS AGREEMENT. THIS LIMITATION APPLIES TO ALL CAUSES OF ACTION IN THE AGGREGATE, INCLUDING, WITHOUT LIMITATION, EQUITABLE CLAIMS, BREACH OF CONTRACT, AND BREACH OF WARRANTY, PEDIGREE'S NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION AND OTHER TORTS.

8.3   **Essential Basis.** The Parties acknowledge and agree that the disclaimers, exclusions and limitations of liability set forth in this Section 8 form an essential basis of this Agreement, and that, absent any of such disclaimers, exclusions or limitations of liability, the terms of this Agreement, including, without limitation, the economic terms, would be substantially different.

9   **INDEMNIFICATION.**

9.1   **Indemnification of Client.** Pedigree agrees to indemnify, defend and hold harmless Client from and against any and all losses, liabilities, costs (including reasonable attorneys' fees) or damages resulting from any claim by any third party that the Hardware manufactured by Pedigree, Hosted Applications or Pedigree Marks infringe such third party's intellectual property rights under the applicable laws of any jurisdiction within the United States of America, provided that, notwithstanding the foregoing, Pedigree will have no obligation to indemnify Client if the alleged infringement arises, in whole or in part, due to modification of the foregoing by Client or upon Client's request or direction or due to unauthorized use by Client. If any claim for which indemnity is or may be sought is made or appears reasonably possible, Client agrees (i) promptly to notify Pedigree in writing; (ii) to cooperate with Pedigree, and to allow Pedigree sole authority to control the defense and settlement of such claim; and (iii) to permit Pedigree, at Pedigree's sole discretion, to enable Client to continue to use the Licensed Technology or to obtain licenses for, modify or replace any such infringing material to make it non-infringing, provided that, if Pedigree determines that none of the foregoing alternatives is reasonably available, Client will, upon written request from Pedigree, cease use of, and, if applicable, return, such materials as are the subject of the relevant infringement claim.

9.2   **Indemnification of Pedigree.** Client agrees to indemnify, defend and hold harmless Pedigree and its third-party vendors from and against any and all losses, liabilities, costs (including reasonable attorneys' fees) or damages resulting from any claim arising out of or relating to: (i) any claim by any third party that any of the Client Marks, or any of the Client's data or forms transmitted via the Licensed Technology infringes such third party's intellectual property rights; or (ii) any claims, demands or liability, including any losses, costs, expenses, and attorney's fees, arising out of or resulting from any injury, including death, to persons or damage to property caused, directly or indirectly, by the Licensed Technology due to the negligent acts or omissions of Client.

10   **CONFIDENTIAL INFORMATION**

10.1   **Ownership of Confidential Information.** Both Parties agree that all items of Confidential Information are proprietary to the disclosing Party or third party, as applicable, and will remain the sole property of the disclosing Party or such third party.

10.2   **Mutual Confidentiality Obligations.** Each Party agrees as follows: (i) to use Confidential Information disclosed by the other Party only for the purposes described in this Agreement; (ii) that such Party will not reproduce Confidential Information disclosed by the other Party, and will hold in confidence and protect such Confidential Information from dissemination to, and use by, any third party; (iii) that neither Party will create any derivative work from Confidential Information disclosed to such Party by the other Party; (iv) to restrict access to the Confidential Information disclosed by the other Party to such of its personnel, agents, and/or consultants, if any, who have a need to access the information and who have been advised of and have agreed in writing to treat such information in accordance

Client Initials _DR_

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

the terms of this Agreement; and (v) to return, or at the other Party's request destroy, all Confidential Information disclosed by the other Party that is in its possession upon termination or expiration of this Agreement.

10.3 **Confidentiality Exceptions**. Notwithstanding the foregoing, the provisions of Sections 10.1 and 10.2 will not apply to Confidential Information that (i) is publicly available or in the public domain at the time disclosed; (ii) is or becomes publicly available through no fault of the recipient; (iii) is rightfully communicated to the recipient by persons not bound by confidentiality obligations; (iv) is already in the recipient's possession, as shown by documentation existing prior to the date of disclosure, free of any confidentiality obligations at the time of disclosure; or (v) is independently developed by the recipient. In addition, each Party may disclose Confidential Information of the other Party (1) in response to an order of a court or other governmental body, provided that the Party making the disclosure pursuant to the order will first have given notice to the other Party and made a reasonable effort to obtain a protective order, (2) as required by law or regulation to be disclosed or (3) in order to establish a Party's rights under this Agreement, including to make such court filings as may be required, provided that in each case, the Party required to disclose minimizes such disclosures to the extent legally permissible.

11  GENERAL.

11.1 **Force Majeure.** Notwithstanding any other provision of this Agreement, neither party shall be deemed in default of this Agreement for delay, failure in performance, loss or damage due to any of the following force majeure conditions: fire, strike, embargo, explosion, power irregularities, earthquake, nuclear accident, terrorism, volcanic action, flood, war, water, the elements, labor disputes, civil disturbances, government requirement, civil or military authority, acts of God or public enemy, inability to secure products or transportation facilities, acts or omissions of common carriers or other causes beyond their reasonable control, whether or not similar to the foregoing.

11.2 **Assignment.** Client shall not assign its rights under this Agreement without the prior written consent of Pedigree, which shall not be unreasonably withheld. Any attempted assignment or delegation in contravention of this Section shall be void. However, upon written notice to Pedigree, Client may sublicense its rights and privileges herein to any wholly-owned subsidiary, in all events Client shall remain fully liable for its and its subsidiary actions and payments.

11.3 **Export Regulations.** Client shall comply with all export regulations pertaining to the Licensed Technology (including the Hardware) in effect. Without limiting the generality of the foregoing, Client expressly warrants that it will not directly or indirectly export, re-export or transmit the Licensed Technology in violation of any export laws, rules or regulations of Canada or the United States.

11.4 **Notices.** Except as otherwise provided in this Agreement, all notices or other communications hereunder shall be deemed to have been duly given when made in writing and delivered in person or deposited in the United States mail, postage prepaid, certified mail, return receipt requested, and addressed to Client and to Pedigree at the addresses listed in the preamble to this Agreement.

11.5 **No Third Party Beneficiaries**. The Parties acknowledge that the covenants set forth in this Agreement are intended solely for the benefit of the Parties, their successors and permitted assigns. Nothing in this Agreement, whether express or implied, will confer upon any person or entity, other than the Parties, their successors and permitted assigns, any legal or equitable right whatsoever to enforce any provision of this Agreement. Notwithstanding the foregoing, Pedigree may assign all of its rights, but none of its obligations, under the terms of this Agreement to a third party without notice to Client.

11.6 **Independent Contractors**. For all purposes of this Agreement, each Party will be and act as an independent contractor and not as partner, joint venturer, or agent of the other and will have no authority to bind nor will it attempt to bind the other to any contract or commitment of any type.

11.7 **Promotion**. Both Parties agree to allow each other to mention the other Party in connection with speaking engagements, Web sites, client proposals and other communications sent by the Party to existing and potential customers and others indicating the relationship of the two Parties. Pedigree may document a business case for the deployed solution and seek the other Party's review prior to release. Pedigree may list the other Party's logo on its website and other promotional material where applicable. Pedigree may distribute a press release announcing the contract execution between Pedigree and the other Party. However, prior review and consent must be obtained from the other Party for any press releases pertaining to this Agreement or the Parties' relationship with each other. The consent will not be unreasonably withheld or delayed, if so, either Party has the right to release such information without consent.

11.8 **Precedence Over Purchase Order Terms and Conditions.** Any additional or different terms contained in Client's purchase order, whether or not such terms materially alter this Agreement, shall be deemed objected to by Pedigree and of no force or effect unless the parties expressly amend this Agreement in writing. Execution of a Client's purchase order shall not operate as an amendment to this Agreement. Whenever printed, typed, stamped or written provisions of Client's purchase order conflict with this Agreement, this Agreement shall control.

11.9 **Waivers of Default.** Waiver by either Party of any breach or default by the other Party shall not be deemed a continuing waiver of such breach or Default or a waiver of any other breach or Default.

11.10 **Survival.** The terms and conditions contained in sections 2, 4, 7.4, 8, 9, 10 and 11 this Agreement survive the performance hereof by either or both parties hereunder.

11.11 **Headings.** The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

11.12 **Governing Law**. This Agreement will be governed by and interpreted in accordance with the laws of the State of North Dakota, without regard to conflicts of law principles thereof or to the United Nations Convention on the International Sale of Goods. For purposes of all claims brought under this agreement, each of the parties hereby irrevocably submits to the exclusive jurisdiction of the state courts of the State of North Dakota located in Cass County and the United States District Court for North Dakota located in Fargo, North Dakota.

11.13 **Entire Agreement**. The Master Agreement comprised of this T&C, the OneView Contract Agreement and any addenda, amendments or supplements thereto entered into by and between the Parties from time to time will constitute the entire Agreement between Client and Pedigree with respect to its subject matter and supersedes all proposals, oral or written, all negotiations, conversations, or discussions between or among Parties relating to the subject matter of this Agreement. No changes, modifications or waivers may be made to this Agreement unless evidenced in writing and signed for and on behalf of both Parties.

11.14 **Severability.** If any of the provisions of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render unenforceable the entirety of this Agreement, but rather, unless a failure of consideration would result therefrom, the entirety of this Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions, and the rights and obligations of Pedigree and Client shall be construed and enforced accordingly.

Client Initials  DR

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

# OneView Contract Agreement

Master Agreement # (Client #) _____



4776 28th Ave S
Fargo, ND 58104
Tel: (701) 293-9949   Fax: (701) 364-0298

**SAFETY STOCK**

**New Subscription (T&C attached)**

**Contract #** _____
**Quote Number:** _____
**Quote Name:** Quote for _____
**Client:** _____

**Quote Valid Until:** _____

| Bill To<br>**FastTrac Transportation**<br>**16220 Air Center Blvd.,**<br>**Houston, TX 77032** | Sold To<br>FastTrac Transportation<br>Drop ship to multiple locations<br>Each receiving location/DOT # will be invoiced separately |
|---|---|
| **Initial Term:** 36 Mo.<br>**Renewal Term:** 12 Mo.<br>**Auto Renew:** Yes | **Billing Method:** Both<br>**Payment Method:** ACH<br>**Payment Term:** Due Upon Receipt |

| PRODUCT | CHARGE | PERIOD | EFFECTIVE PRICE | QTY | TOTAL PRICE |
|---|---|---|---|---|---|
| Cab-Mate One (ELD Chrome) P-CM1-V-1022 & Fleet Manager w/ Diagnostics, Verizon LTE, OneView Saas, Forward facing camera P-DC-X-2029 , 64GB SD card H-PRT-0-2025 & Suction Cup or hard mount | OnePrice | Month | $56.50 | 100 | $5,650.00 |
| 5- 6pin & 5-9pin round install cables | - | One Time | $32.00 | 10 | $320.00 |
| | | | Initial Upfront Charges* | | $320.00 |
| | | | Recurring Monthly Charges | | $5,650.00 |
| | | | Recurring Annual Charges | | $0.00 |

*Client may add additional units at the pricing contained herein for a period of 180 days after contract effective date.*

**Special Provisions**

This is a running order for Safety Stock kits. Houston and Lafayette will each take 20 units to start. Pedigree will auto replenish the pool once inventory reaches 10 per location. They will come with a variety of install plugs.  Terms are 60 from shipment. OnePrice includes: CabMate One Hardware Kit, Forward facing camera, 64GB SD card, suction, hard mount or cup mount, Monthly OneView SaaS, speed by road, Maintenance Manager & Verizon data for OneView. If FastTrac decides to add additional outside applications to the Android tablet additional data rates will apply. Price to be determined once Pedigree tests the application. If FastTrac decides to add Turn by Turn Navigation or Jobs with route Integration there will be an additional $3 each per truck per application fee added to the monthly dues.  Integration work with Omni dispatch will be determined at the time of the scope of work.

Client Initials  *DR*

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

\* Unless otherwise provided in the pricing above, installation services, shipping and handling, training services, travel and other related expenses are not included, and such items, if provided by Pedigree, are to be priced and invoiced separately from Pedigree to Client.  See **Exhibit A – Implementation Plan**.

Purchased Hardware will be invoiced to Client 60 days from shipment, pursuant to **Exhibit A – Implementation Plan**, and will be due upon receipt of invoice by Client.

Ongoing support (and other services) information and elections are included in the attached **Exhibit B – Support and Services**.

Recurring Monthly charges shall be invoiced monthly beginning with the Term Start Date (see Section 1.15 Term Start Date).

By executing this OneView Contract Agreement for the provision and acquisition of products and services, the undersigned Parties agree to abide by the contractual terms and conditions contained in that certain Pedigree Technologies, LLC Master Agreement-Terms and Conditions (the "T&C") and incorporated herein by reference.

The undersigned acknowledge and agree that this OneView Contract Agreement, the T&C and any exhibits, addenda, amendments or supplements thereto - entered into by and between the Parties from time to time - together comprise the "Master Agreement" between the Parties and that the provision of products and services by Pedigree Technologies, LLC under this OneView Contract Agreement, and the rights and obligations of the undersigned Client and Pedigree Technologies, LLC, are subject to all of the terms and conditions contained in said Master Agreement.

**IN WITNESS WHEREOF,** Client and Pedigree have caused this Agreement to be duly executed by their respective authorized representatives as noted below, as of the Effective Date of _____
(Contract Effective Date)

|  |  |
|---|---|
| **FastTrac Transportation** | **PEDIGREE TECHNOLOGIES, LLC** |
| By: _David Robertson_ (DocuSigned by: 901313687BDE4AC...) (Signature) | By: _____ (Signature) |
| Name: David Robertson (Print or Type) | Name: _____ (Print or Type) |
| Title: Vice President of Safety | Title: _____ |

Client Initials  *DR* (DocuSigned)

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

Pedigree Technologies, LLC

MASTER AGREEMENT –TERMS AND CONDITIONS

Master Agreement No. _____

THIS MASTER AGREEMENT TERMS AND CONDITIONS ("T&C") contains the terms and conditions governing the purchase of products and services from Pedigree Technologies, LLC and is entered into as of the date set forth in the OneView Contract Agreement by and between Pedigree Technologies ("Pedigree"), 4776 28th Ave S, Fargo, North Dakota 58104, and ("Client"), which incorporates this T&C by specific reference. The OneView Contract Agreement and this T&C (and any addenda, amendments or supplements entered into by and between the Parties from time to time) together constitute the "Master Agreement" between Pedigree and Client.

**1      Definitions.**

1.1     **Authorized End User** shall mean any individual employee or contractor of Client accessing or using the Hosted Applications solely for the benefit of Client.

1.2     **Client Information** shall mean all Client data transmitted over the Communications Network and Hardware and/or stored in Hosted Applications.

1.3     **Client Marks** shall mean all Client-owned logos, trademarks, and domain names.

1.4     **Communications Networks** shall mean the third party networks (cellular and/or satellite) through which the Hardware is connected to utilize the Hosted Applications provided by Pedigree.

1.5     **Confidential Information** shall include all written or oral information, disclosed by either Party to the other, concerning or related to the operations of either Party (or otherwise identified as confidential information by the disclosing Party). It shall also include any third party disclosures that have been clearly identified as confidential, as well as disclosures which, by the nature of the circumstances surrounding such disclosure, ought reasonably to be viewed and treated as confidential and specifically includes information regarding the pricing and other terms and conditions upon which Pedigree provides its products and services.

1.6     **Good Working Order** shall mean Hardware that meets Pedigree specifications stated in the Master Agreement or as provided in user documentation.

1.7     **Hardware** shall mean the Pedigree-provided devices and any ancillary accessories necessary to connect to and communicate with Pedigree's Hosted Applications.

1.8     **Hosted Application(s)** shall mean (i) the ability to access features and functions of the software application(s) and any and all other hosted content made available by Pedigree to Client and/or (ii) a data feed made available to Client.

1.9     **Licensed Technology** shall mean collectively the software, if any, embedded within Hardware, and Hosted Applications to which the Client is provided access based upon the terms of the Master Agreement with Pedigree.

1.10    **MASTER AGREEMENT** shall mean collectively those certain agreements between the Parties comprised of: the OneView Contract Agreement, to which this T&C is attached; this T&C; and any addenda, amendments or supplements thereto entered into by and between the Parties from time to time. The Master Agreement shall define and control the business relationship of the Parties as it pertains to the subject matter of these documents.  The Master Agreement is sometimes referred to in this T&C, and may be referred to in a OneView Contract Agreement, as "this Agreement" or "the Agreement."

1.11    **OneView Contract Agreement** shall mean those certain agreements, executed by the Parties from time to time and specifying the specific products and services to be acquired by Client from Pedigree, whether by new subscription or by addendum.  Any such OneView Contract Agreement shall be in substantially the form of the OneView Contract Agreement to which this T&C is attached, and Client's purchase of specific products and services from Pedigree pursuant to any future such OneView Contract Agreement shall be subject to the terms and conditions contained in this T&C.

1.12    **Party or Parties** means individually or collectively, as the case may be, Pedigree and Client and any and all permitted successors and assigns**.**

1.13    **Pedigree Marks** shall mean all Pedigree-owned logos, trademarks and domain names.

1.14    **Term** shall mean the period during which Client recieves services from Pedigree as specified in the OneView Contract Agreement, subject to, and as modified by, the provisions of Section 8 of this T&C.

1.15    **Term Start Date**, unless otherwise provided by Exhibit A – Implementation Plan, shall mean the earlier of (i) 30 days after the date Hardware is shipped from Pedigree to Client pursuant to the Master Agreement, or (ii) the date all hardware has been installed.

2       Access Grants, Software licenses and Terms of Use.

2.1     **Provision and Access**. Subject to the terms and conditions contained herein, Pedigree agrees to provide access to the features and functions of the Hosted Application and Communication Network during the Term solely for use by Authorized End Users. Pedigree shall provide to Client the necessary passwords and internet addresses to allow Client to access the Hosted Application.

2.2     **Access Grant**; **Licensed Technology License**. Subject to the terms and conditions contained herein, and including the payment of the applicable fees, Pedigree grants Client  a limited, non-transferable, non-sublicenseable, non-exclusive, royalty-free right and license to use the Licensed Technology in a fully assembled state solely for Client's own internal business use. Client shall not copy, reproduce, modify, or attempt to reverse engineer, decompile, disassemble, reverse translate or in any manner decode the object code of any Licensed Technology in order to derive, obtain or perceive the source code from which any component thereof is compiled or interpreted.  Client acknowledges that nothing in this Agreement will be construed to grant Client the right or ability to (i) any intellectual property, (ii) modify the Licensed Technology or create any derivative product from any of the foregoing, (iii) obtain or use such source code; or (iv) assign, sublicense, sell, resell, lease, rent or otherwise transfer or convey, or pledge as security or otherwise encumber, Client's rights granted herein to the Licensed Technology. Client will not, without Pedigree's express written consent, use, duplicate or disclose any technical data or any information on the construction of the Licensed Technology for any purposes other than for the installation, operation or maintenance thereof.  Client will ensure that its use of the Licensed Technology complies with all applicable laws, statutes, regulations or rules promulgated by governing authorities having jurisdiction over the Parties and/or the Licensed Technology.

2.3     **Pedigree Retained Rights; Ownership.** Subject to the rights granted in this Agreement, Pedigree and its third party vendors retain all right, title and interest in and to the Licensed Technology and its related intellectual property rights, and the Pedigree Marks. Client acknowledges that it neither owns nor acquires any additional rights in and to the foregoing not expressly granted by this Agreement.  Client further acknowledges that Pedigree retains the right to use the foregoing for any purpose in Pedigree's sole discretion.

2.4     **Client Retained Rights; Ownership**. Pedigree grants to Client the right to use the Hardware together with the software embedded in the Hardware for the term of this Agreement.  Client may only use Hardware within the continental United States, its coastal waters, and Canada. In addition, Client retains all right, title and interest in and to Client Marks and Client Information, and Pedigree acknowledges that it neither owns nor acquires any additional rights in and to the foregoing

Client Initials \_\_\_\_ DR

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

than the rights expressly granted by this Agreement, including rights granted to Pedigree pursuant to Section 11.1 of this T&C.  Client grants to Pedigree a non-exclusive, royalty-free right and license in all Client's Information and Client Marks, but only for the following purposes: (i) to perform the services, internal testing and continued product development contemplated under this Agreement; (ii) to disclose in verbal or written form, in an anonymous summary format with other client data that does not directly identify the Client nor its customers to be used for Pedigree business planning, traffic forecasting and patterns and other management and analytical needs; and (iii) for Pedigree's use as permitted by Section 11.1 of this T&C.

2.5   **Authorized End User Access to the Hosted Application.** Client may permit an Authorized End User to use the Hosted Application. Client will ensure that any such Authorized End User will be bound by an enforceable contractual agreement which shall by its terms provide substantially the same or greater protection for Pedigree's Confidential Information, the Licensed Technology, documentation, and/or user guides as are provided by the terms contained herein**.** Client acknowledges and agrees that, Client shall be responsible for all acts and omissions of Authorized End Users, and any act or omission by an Authorized End User, that if undertaken by Clients would constitute a breach of this Agreement, shall be deemed a breach of this Agreement by Client.

2.6   **Development Services.** Unless separately agreed by the Parties, Pedigree shall own all right, title and interest in and to any deliverables developed by Pedigree.

**3**     **Licensed Technology Terms of Use; Performance.**

3.1   **Performance.** Pedigree's duties and responsibilities contained herein shall be performed by Pedigree and/or its assignees, agents and/or subcontractors.

3.2   **Coverage and Data Transmission:** The access and use of the Communication Network, Global Position System ("GPS") network, and the Internet are dependent on the coverage and calling areas of networks owned by, operated by, and under sole control of third parties, and are made available to Client, subject to availability, over which Pedigree assumes no control. Client acknowledges that Pedigree is not responsible for limits in Communication Network coverage, loss of GPS signal or internet accessibility, due to (i) environment variables or performance degradation; (ii) due to any actions of third-parties outside the control of Pedigree; or (iii) transmissions from Hardware antennae that have an obstructed view of the sky, are in enclosed spaces, in buildings, between tall buildings, underground or in canyons or similar line of sight obstructions.

3.3   **Client acknowledgements.** Client acknowledges that (i) Client Information collected by the Hardware while out of coverage, without access to the Communication Networks, or outside a reporting interval may not be able to be stored and retrieved by Client when coverage or calling connectivity is restored; (ii) Client Information may not be in real time and delays in receipt of data are normal; (iii) data collected by Hosted Applications will be stored on a Pedigree server for ninety (90) days which data, after such ninety (90) days, may be archived or purged at Pedigree's sole discretion; and (iv) Client assumes the entire risk in downloading or otherwise accessing any data, information, files or other materials obtained from the Pedigree's business support network or any Hosted Applications; (v) Hosted Applications, which provide location or directional information are to be used only as an aid in planning, as with any maps or driving directions, Client should always recheck directions and driving conditions for accuracy and confirm that the road still exists, be aware of construction and other hazards and follow all safety precautions and the law; and (vi) due to the factors described in this Agreement and Section 3.3, the Client Information and data transmitted through Hardware may not get to its intended destination in real time and Client should plan accordingly.   Client acknowledges and agrees that the amounts due to Pedigree for services provided pursuant to any OneView Contract Agreement and the Master Agreement are not subject to reduction, abatement or setoff due to any interruption in service, access or use arising from or associated with any circumstances described in this Section 3.

3.4   **Access Limit.**  Pedigree reserves the right, as required and without advance notice to Client, to control, restrict, and/or disable Clients' hardware communication over the Communication Network to prevent any negative impact to other Clients and/or the Hosted Application.

**4**     **Fees and Other Charges**.

4.1   **Fees**. During the term of this Agreement, Client agrees to compensate Pedigree as set forth in (i) any OneView Contract Agreement that is executed by the Parties as a part of the Master Agreement and (ii) this T&C, including Section 4.8 hereof.  All fees and charges are in U.S. dollars. Fees are subject to change and may be adjusted prior to the execution of a OneView Contract Agreement, or after the end of a then current Term. Client may not abate, reduce, or set-off any amounts due under any Pedigree invoice other than as provided for under Section 4.7, but shall pay any such amounts to Pedigree in full when due and shall only seek a refund or return of amounts paid pursuant to the procedures for disputed charges set forth in Section 4.7 hereof.

4.2   **Monthly Client Fees.** Monthly Client Fees shall include all fees due for Communication Network, Hosted Applications and Pedigree financed Hardware as applicable and as set forth in the OneView Contract Agreement.  Client shall pay the Monthly Client Fees for each Hardware unit, regardless of activation date, to be activated on the Communications Network or Hosted Application specified in the applicable OneView Contract Agreement, beginning on the Term Start Date.

4.3   **Termination Fee.** Should t**h**is Agreement be terminated or a Hardware unit deactivated prior to when a Hardware unit has completed an individual term as specified in the OneView Contract Agreement, Client shall pay a termination fee equal to the applicable Monthly Client Fees due for the remainder of the OneView Contract Agreement period, as either applies to the terminated Agreement or to the deactivated Hardware unit(s) (as the case may be).

4.4   **Other Fees and Charges.**  Pedigree reserves the right to charge for additional services requested by Client outside the scope of this Master Agreement and then existing OneView Contract Agreements, including but not limited to: development services; professional services; Hosted Application data recovery; on-site training; on-site hardware install, repair, servicing, or activation; invoicing to multiple sites; shipment expediting or shipping to multiple locations; or custom reporting.  Charges for such services shall be negotiated between the Parties and evidenced in writing. Pedigree has no obligation to provide any such services absent a written agreement.

4.5   **Taxes**. All prices and rates on the Schedule(s) of Charges to be provided under this Agreement do not include sales, use, excise, GST, Universal Service Charge or other transactional taxes (**"Taxes"**). These taxes may be included in charges detailed on Pedigree's invoice to Client unless Client provides Pedigree with a tax exemption certificate annually that is acceptable to applicable taxing authorities. Client will hold Pedigree harmless from all claims and liability arising from Client's failure to support or pay any such taxes, including but not limited to duties, tariffs or charges.

4.6   **Invoices.** Unless otherwise provided in the OneView Contract Agreement, Client agrees to make payment in full of all undisputed charges not later than thirty (30) days after the invoice date ("Due Date"). Overdue payments may, at Pedigree's sole discretion, be subject to late charges, in an amount equal to 1.5% of the amount then due for each month, or portion thereof, that said overdue payments are not made (or such lesser rate as may be the maximum permissible rate under applicable law), and compounded monthly. In addition, Pedigree may also suspend Client's access to the Hosted Application and Communication Network, with five (5) days written notice, and/or suspend any Hardware shipments if Client has not made payment in full by the Due Date. Client shall also reimburse Pedigree for Pedigree's reasonable collection and litigation expenses, including attorney's fees, incurred by Pedigree to collect any late payment and Client shall be required to pay a reinstatement fee of $25 per Hardware device to reactive any suspended access to the Hosted Application and/or Communication Network.  Pedigree shall send all invoices to Client as directed in the applicable OneView Contract Agreement.

4.7   **Disputed Charges**. CLIENT ACKNOWLEDGES AND AGREES THAT ANY CLAIMS IT MAY HAVE AGAINST PEDIGREE UNDER THE TERMS OF AGREEMENT SHALL BE MADE SOLELY AGIANST PEDIGREE AND NOT ANY ASSIGNEE OF PEDIGREE, NOTWITHSTANING ANY CREDITS, OFFSET RIGHTS, OR CANCELLATION RIGHTS THAT MAY BE PROVIDED FOR HEREIN UNDER THIS AGREEMENT.  In the event Client, in good faith, disputes any charges stated in a Pedigree invoice, such dispute shall not relieve Client's obligation to make such payment.  However Client may seek reimbursement from Pedigree for all or a portion of any invoice in dispute in the manner provided for herein, provided that, within fifteen (15) days of receipt of such invoice, Client (i) notifies Pedigree in writing of the disputed charges, specifying in detail the disputed amount(s), the specific Client details pertaining to the disputed amounts and the basis of the dispute; (ii) pay all invoiced amounts; and (iii) uses all reasonable efforts to promptly resolve the dispute. Pedigree shall have sixty (60) days from the

Client Initials  DR

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

date of Client's notification hereunder to provide Client with Pedigree's response in connection with a disputed item. If the Client fails to provide Pedigree with such written notice of the dispute within fifteen (15) days of the invoice date, then Pedigree shall have no obligation to investigate or reimburse any paid invoices to Client and the Client waives any rights to dispute such charges and such pay all amounts specified in the applicable invoice by the due date specified in such invoice, without any abatement, reduction or set-off. If any such dispute remains unsettled after sixty (60) days, the Parties agree to submit such dispute to a mutually acceptable Registered Mediator located in the State of North Dakota with the mediation to be conducted in person or telephonically, and conduct good faith pre-suit mediation prior to filing a complaint in any court.  Client's only recourse is to seek indemnification from Pedigree for the amount of such disputed claims and reimbursement for any paid invoiced amounts.

4.8   **Client Credit**. Client acknowledges and agrees that Client must satisfy Pedigree's credit criteria then in effect, from time to time, to receive continued access to the Licensed Technology, if Client allows any payment to Pedigree to be overdue by more than sixty (60) calendar days.

4.9   **Additional Purchases**. Unless otherwise agreed in writing, client shall execute an additional OneView Contract Agreement (Addendum) for all subsequent purchases of Hardware and/or Services, including any component of the Licensed Technology. Once a OneView Contract Agreement has been executed by Client and accepted by Pedigree, such OneView Contract Agreement is considered firm and cannot be cancelled or changed by Client without Pedigree's written consent.

**5      HARDWARE Delivery, Maintenance and Repair.**

5.1   **Point of Delivery.**  All Hardware purchased by Client from Pedigree is shipped freight on board (FOB) from a Pedigree-designated warehouse facility.  Pedigree shall arrange and pay for the shipping and handling, but such charges shall be billable to Client, unless otherwise provided in the OneView Contract Agreement, of such Hardware from its warehouse to the shipping address specified in the OneView Contract Agreement.  Client shall be responsible for insurance and bear all risk of loss for such Hardware upon delivery to Client's shipping address.

5.2   **Hardware Installation**. Client shall be solely responsible for (i) the installation of Hardware, unless Installation Services are purchased from Pedigree and included in the OneView Contract Agreement; and (ii) for all integration with any hardware and/or software applications not purchased from Pedigree. "Installation" shall mean attachment of Hardware and its related accessories, if required to the Client's vehicle or other asset.  If Installation is purchased from Pedigree, the Parties shall each make commercially reasonable efforts to schedule and complete Installation within thirty (30) days of receipt of Hardware by Client. Purchased installation services will be provided by Pedigree Employees or Certified 3rd Party Installation Vendors.  Standard Installation hours are between 7:00 a.m. and 6:00 p.m., Monday through Friday, Client's local time. Client shall be charged $75 per vehicle for each vehicle that was scheduled for installation but was not available within fifteen (15) minutes of the scheduled installation time or if the installation scheduled time is changed by Client less than twenty-four (24) hours prior to such scheduled installation. Client also agrees to provide a reasonably safe work environment at the installation site. Client acknowledges that, in connection with the installation, Pedigree may modify or alter, including without limitation drill holes, cut panels and body or rewire Client's vehicles or other assets. Pedigree will not be responsible for, and makes no assurances regarding, the restoration of Client's vehicles to their unmodified or unaltered condition.

5.3   **Hardware Warranty**.  Pedigree shall provide a limited warranty on new Hardware provided to the Client by Pedigree, for a Warranty Period of one (1) year from date of Shipment to Client's shipping address.  During the Warranty Period, the Hardware shall be repaired by Pedigree (or its third party vendor) due to issues related to materially defective materials, materially faulty workmanship, or incapability of connecting to Communications Networks. These obligations shall not apply to: (i) hardware normally consumed in operation such as fuses, cables, antennae or mounting brackets; or (ii) defects which, due to no fault of Pedigree, are the result of: (a) Client's unauthorized or improper use of the Hardware (improper operation and/or use with other equipment); (b) detrimental exposure to weather, water, and/or fire; (c)  involvement in any accident, explosion, or Act of God; (d) tampering, alteration or repair by any party other than Pedigree or its authorized installers without Pedigree's prior written consent; or (e) broken seal, improper storage, installation or implementation, alteration to external antenna by Client.

5.4   **Return Authorization**. Pedigree shall perform maintenance after proper notification by Client that any Hardware purchased from Pedigree is not in Good Working Order.  Proper notification will be deemed to have occurred only after (i) Client has worked with Pedigree's customer support team to evaluate, troubleshoot and test any unit that does not appear to be in Good Working Order; (ii) Pedigree's customer support team determines that the Hardware cannot be repaired over the phone or over the air, and Client is  assigned a Return Material Authorization Number ("**RMA**"); and (iii) Client de-installs and returns the failed Hardware to a Pedigree-designated facility for repair.  Client shall be responsible for all costs associated with the de-installation of the Hardware deemed not to be in Good Working Order, including shipping costs to Pedigree's facility, and all risk of loss in transit to and from Client's location. The assigned RMA shall be clearly visible on each shipping form and associated shipping carton; and (iv) Client shall be responsible for the installation of the repaired or replacement Hardware.

5.5   **Under Warranty Repairs**. Pedigree shall return the Hardware, or new or reconditioned Hardware, at Pedigree's option, free of charge to Client via best way ground, unless otherwise specified by Client (with additional costs thereof to Client's account).  Pedigree's obligation is limited to restoring the Hardware to Good Working Order.  Should Client send Hardware to be repaired under this Section 5 that is not covered by the Warranty Period or was in Good Working Order when received, Client shall be charged for Non-Warranty repairs and costs of return shipment.

5.6   **Non-Warranty Repairs**. Upon issuance by the Client of a purchase order including return shipping costs, all work performed on Hardware outside the Warranty provisions of this Agreement shall be done on a time and materials basis, with the hourly rate for non-Warranty repairs to be $150.00.  Notwithstanding the foregoing, Hardware sent in for repair for which no problem was found shall be charged at a rate of $150.00. Retail price will be charged for any Hardware replaced that is not covered under standard Warranty terms. Pedigree may, in its sole discretion, replace defective Hardware with new or used comparable Hardware manufactured by the same or other manufacturers.

**6      SUPPORT.**

6.1   **Support**. Pedigree's Licensed Technology support is available by telephone or e-mail Monday through Friday, from 7:00AM to 6:00PM (Central). E-mail or voice-messages received outside of these business hours shall be responded to within the next business day.

6.2   **File Security.**  Client acknowledges that it is technically possible for third parties to monitor data traffic over the air via the Communication Networks.  If Client desires to secure its transmissions, Client will be solely responsible for providing encryption and security for its data.

6.3   **Hosted Applications.**  Pedigree will, at its own expense, provide for the hosting of Hosted Applications and if applicable, Communications Networks.  Pedigree may enter into an arrangement with one or more third parties for the performance of Pedigree's obligations under this Agreement. During the Term, Client shall receive support, upgrades, revisions, enhancements and extensions to the extent provided by Pedigree or its third-party vendors for the Licensed Technology.

**7      TERM**.

7.1   **Effective Date and Term**. Unless terminated earlier as provided below, the Master Agreement will become effective on the Effective Date as provided in the OneView Contract Agreement (and any applicable Addendums), and will continue in effect for the period stated in the OneView Contract Agreement (normally thirty-six (36) months) from the Term Start Date (the "Initial Term").  Thereafter, unless otherwise provided in the OneView Contract Agreement, the Master Agreement will automatically be renewed for successive twelve (12)-month terms unless either Party gives written notice of intent not to renew the Agreement at least ninety (90) days prior to the end of the then current term.

7.2   **Termination for Breach**. Either Party may terminate this Agreement if the other Party breaches any of its material obligations under this Agreement and fails to cure such breach within thirty (30) days of written notice thereof. In addition, either Party may terminate this Agreement following the other Party's failure to cure any of the following, within five (5) days of written notice thereof, upon: (a) the other Party's provision of a materially false statement or representation; (b) the other

Client Initials  DR

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

Party's insolvency, (c) the other Party's failure to pay debts as they come due; (d) assignment of the other Party's business entity for the benefit of creditors; (e) the other Party's application for or consent to the appointment of a custodian, receiver or trustee for the other Party's or a substantial part of such Party's property or business; or (f) the other Party's institution of bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors by or against such Party. In addition, Pedigree may terminate the Master Agreement if Client breaches any of its payment obligations to Pedigree and has not cured such breach within five (5) days written notice of such failure to make a required payment. (Each of the foregoing is referred to and shall be deemed a "Default" for all purposes of the Master Agreement. Notwithstanding Client's rights of termination, it shall remain bound by the terms and provisions of Section 7.3 herein.

7.3  Client's obligation to make payments provided for in this Agreement and all of its other obligations herein are absolute and unconditional and are not subject to any abatement, set-off, defense or counterclaim for any reason whatsoever. Notwithstanding the foregoing, Client may seek reimbursement or indemnification from Pedigree for any good faith claim it makes against Pedigree on account of a material breach of the terms of this Agreement by Pedigree.

7.4  **Return of Equipment and Materials Upon Termination.** Upon termination of this Agreement, Client shall immediately return Pedigree's Confidential Information Materials to Pedigree. In the case of Pedigree financed Equipment (ONEPRICE, Lease, etc.), Client may retain the delivered and/or installed Equipment, subject, of course, to payment of the Termination Fee. Until the termination fee is paid, however, the Pedigree financed equipment remains as collateral for the financing, and as such may not be retained, sold, transferred, destroyed, or otherwise disposed of without Pedigree's express written consent.

8   DISCLAIMERS, EXCLUSIONS AND LIMITATION OF LIABILITY.

8.1  **DISCLAIMER.** EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE HARDWARE, THE LICENSED TECHNOLOGY AND ANY OTHER MATERIALS, SOFTWARE, DATA AND/OR SERVICES PROVIDED BY PEDIGREE ARE PROVIDED "AS IS" AND "WITH ALL FAULTS," AND PEDIGREE EXPRESSLY DISCLAIMS ANY AND ALL OTHER PROMISES, REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO  ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, NON-INTERFERENCE, VALUE OR ACCURACY OF DATA, AS WELL AS ANY WARRANTIES OF MERCHANTABILITY, SYSTEM INTEGRATION, FITNESS FOR A PARTICULAR PURPOSE,  FITNESS FOR USE FOR LIFE SUPPORT OR EMERGENCY SITUATIONS OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT.  NO WARRANTY IS MADE BY PEDIGREE ON THE BASIS OF TRADE USAGE, COURSE OF DEALING OR COURSE OF PERFORMANCE.  PEDIGREE DOES NOT WARRANT THAT THE LICENSED TECHNOLOGY OR ANY OTHER INFORMATION, MATERIALS, TECHNOLOGY OR SERVICES PROVIDED UNDER THIS AGREEMENT WILL MEET CLIENT'S REQUIREMENTS OR THAT THE OPERATION THEREOF WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT ALL ERRORS WILL BE CORRECTED.  CLIENT ACKNOWLEDGES THAT PEDIGREE'S OBLIGATIONS UNDER THIS AGREEMENT ARE FOR THE BENEFIT OF CLIENT ONLY.

8.2  **PEDIGREE LIMITATIONS OF LIABILITY.** EXCEPT WITH RESPECT TO ITS OBLIGATIONS UNDER SECTION 10.1 AND 11, IN NO EVENT SHALL PEDIGREE BE LIABLE FOR AND CLIENT HEREBY WAIVES ITS RIGHT TO CLAIM, ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS) DIRECTLY OR INDIRECTLY RELATING TO OR ARISING OUT OF PEDIGREE'S BREACH OF THIS AGREEMENT OR CLIENT'S INABILITY TO USE THE LICENSED TECHNOLOGY OR ANY PART THEREOF, EITHER SEPARATELY OR IN COMBINATION WITH ANY OTHER COMMUNICATIONS FACILITIES OR IN CONNECTION WITH ANY SERVICES, PERFORMED OR NOT PERFORMED BY PEDIGREE UNDER THIS AGREEMENT, OR FOR ANY OR ALL LOSS OR DAMAGE DIRECTLY OR INDIRECTLY RELATING TO OR ARISING OUT OF A THIRD PARTY'S UNAUTHORIZED ACCESS TO CLIENT'S DATA TRANSMITTED REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), EQUITY, STRICT LIABILITY OR OTHERWISE, AND WHETHER OR NOT SUCH DAMAGES WERE FORESEEN OR UNFORESEEN, EVEN IF PEDIGREE HAS BEEN ADVISED OF THE POSSIBILITY THEREOF. PEDIGREE'S MAXIMUM AND SOLE LIABILITY TO CLIENT FOR SERVICES HEREUNDER, SHALL BE LIMITED TO CLIENT'S DIRECT DAMAGES, WHICH SHALL IN NO EVENT EXCEED THE AMOUNT EARNED PAID TO PEDIGREE BY CLIENT UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING CLIENT'S WRITTEN NOTICE OF PEDIGREE'S BREACH OF THIS AGREEMENT. THE ENTIRE LIABILITY OF PEDIGREE AND THE EXCLUSIVE REMEDY OF CLIENT SHALL BE REPAIR OR REPLACEMENT OF THE HARDWARE, DURING THE MAINTENANCE PERIOD IF SUCH HARDWARE DOES NOT MEET THE GOOD WORKING CONDITIONS SET FORTH IN THIS AGREEMENT**.**  THIS LIMITATION APPLIES TO ALL CAUSES OF ACTION IN THE AGGREGATE, INCLUDING, WITHOUT LIMITATION, EQUITABLE CLAIMS, BREACH OF CONTRACT, AND BREACH OF WARRANTY, PEDIGREE'S NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION AND OTHER TORTS.

8.3  **Essential Basis**.  The Parties acknowledge and agree that the disclaimers, exclusions and limitations of liability set forth in this Section 8 form an essential basis of this Agreement, and that, absent any of such disclaimers, exclusions or limitations of liability, the terms of this Agreement, including, without limitation, the economic terms, would be substantially different.

9   INDEMNIFICATION.

9.1 Indemnification **of Client**.  Pedigree agrees to indemnify, defend and hold harmless Client from and against any and all losses, liabilities, costs (including reasonable attorneys' fees) or damages resulting from any claim by any third party that the Hardware manufactured by Pedigree, Hosted Applications or Pedigree Marks infringe such third party's intellectual property rights under the applicable laws of any jurisdiction within the United States of America, provided that, notwithstanding the foregoing, Pedigree will have no obligation to indemnify Client if the alleged infringement arises, in whole or in part, due to modification of the foregoing by Client or upon Client's request or direction or due to unauthorized use by Client.  If any claim for which indemnity is or may be sought is made or appears reasonably possible, Client agrees (i) promptly to notify Pedigree in writing; (ii) to cooperate with Pedigree, and to allow Pedigree sole authority to control the defense and settlement of such claim; and (iii) to permit Pedigree, at Pedigree's sole discretion, to enable Client to continue to use the Licensed Technology or to obtain licenses for, modify or replace any such infringing material to make it non-infringing, provided that, if Pedigree determines that none of the foregoing alternatives is reasonably available, Client will, upon written request from Pedigree, cease use of, and, if applicable, return, such materials as are the subject of the relevant infringement claim.

9.2 Indemnification **of Pedigree.** Client agrees to indemnify, defend and hold harmless Pedigree and its third-party vendors from and against any and all losses, liabilities, costs (including reasonable attorneys' fees) or damages resulting from any claim arising out of or relating to: (i) any claim by any third party that any of the Client Marks, or any of the Client's data or forms transmitted via the Licensed Technology infringes such third party's intellectual property rights; or (ii) any claims, demands or liability, including any losses, costs, expenses, and attorney's fees, arising out of or resulting from any injury, including death, to persons or damage to property caused, directly or indirectly, by the Licensed Technology due to the negligent acts or omissions of Client.

10   CONFIDENTIAL INFORMATION

10.1 Ownership **of Confidential Information**. Both Parties agree that all items of Confidential Information are proprietary to the disclosing Party or third party, as applicable, and will remain the sole property of the disclosing Party or such third party.

10.2 Mutual **Confidentiality Obligations**.  Each Party agrees as follows: (i) to use Confidential Information disclosed by the other Party only for the purposes described in this Agreement; (ii) that such Party will not reproduce Confidential Information disclosed by the other Party, and will hold in confidence and protect such Confidential Information from dissemination to, and use by, any third party; (iii) that neither Party will create any derivative work from Confidential Information disclosed to such Party by the other Party; (iv) to restrict access to the Confidential Information disclosed by the other Party to such of its personnel, agents, and/or consultants, if any, who have a need to access the information and who have been advised of and have agreed in writing to treat such information in accordance

Client Initials  *DR*

DocuSign Envelope ID: 3CFA5DB4-97DA-49B1-865E-773CB7243A43

the terms of this Agreement; and (v) to return, or at the other Party's request destroy, all Confidential Information disclosed by the other Party that is in its possession upon termination or expiration of this Agreement.

10.3 Confidentiality **Exceptions**. Notwithstanding the foregoing, the provisions of Sections 10.1 and 10.2 will not apply to Confidential Information that (i) is publicly available or in the public domain at the time disclosed; (ii) is or becomes publicly available through no fault of the recipient; (iii) is rightfully communicated to the recipient by persons not bound by confidentiality obligations; (iv) is already in the recipient's possession, as shown by documentation existing prior to the date of disclosure, free of any confidentiality obligations at the time of disclosure; or (v) is independently developed by the recipient. In addition, each Party may disclose Confidential Information of the other Party (1) in response to an order of a court or other governmental body, provided that the Party making the disclosure pursuant to the order will first have given notice to the other Party and made a reasonable effort to obtain a protective order, (2) as required by law or regulation to be disclosed or (3) in order to establish a Party's rights under this Agreement, including to make such court filings as may be required, provided that in each case, the Party required to disclose minimizes such disclosures to the extent legally permissible.

11    **GENERAL.**

11.1 Force **Majeure.**  Notwithstanding any other provision of this Agreement, neither party shall be deemed in default of this Agreement for delay, failure in performance, loss or damage due to any of the following force majeure conditions: fire, strike, embargo, explosion, power irregularities, earthquake, nuclear accident, terrorism, volcanic action, flood, war, water, the elements, labor disputes, civil disturbances, government requirement, civil or military authority, acts of God or public enemy, inability to secure products or transportation facilities, acts or omissions of common carriers or other causes beyond their reasonable control, whether or not similar to the foregoing.

11.2 Assignment**.**  Client shall not assign its rights under this Agreement without the prior written consent of Pedigree, which shall not be unreasonably withheld. Any attempted assignment or delegation in contravention of this Section shall be void. However, upon written notice to Pedigree, Client may sublicense its rights and privileges herein to any wholly-owned subsidiary, in all events Client shall remain fully liable for its and its subsidiary actions and payments.

11.3 Export **Regulations.** Client shall comply with all export regulations pertaining to the Licensed Technology (including the Hardware) in effect. Without limiting the generality of the foregoing, Client expressly warrants that it will not directly or indirectly export, re-export or transmit the Licensed Technology in violation of any export laws, rules or regulations of Canada or the United States.

11.4 Notices**.**  Except as otherwise provided in this Agreement, all notices or other communications hereunder shall be deemed to have been duly given when made in writing and delivered in person or deposited in the United States mail, postage prepaid, certified mail, return receipt requested, and addressed to Client and to Pedigree at the addresses listed in the preamble to this Agreement.

11.5 No **Third Party Beneficiaries**.  The Parties acknowledge that the covenants set forth in this Agreement are intended solely for the benefit of the Parties, their successors and permitted assigns.  Nothing in this Agreement, whether express or implied, will confer upon any person or entity, other than the Parties, their successors and permitted assigns, any legal or equitable right whatsoever to enforce any provision of this Agreement.  Notwithstanding the foregoing, Pedigree may assign all of its rights, but none of its obligations, under the terms of this Agreement to a third party without notice to Client.

11.6 Independent **Contractors**.  For all purposes of this Agreement, each Party will be and act as an independent contractor and not as partner, joint venturer, or agent of the other and will have no authority to bind nor will it attempt to bind the other to any contract or commitment of any type.

11.7 Promotion.  Both Parties agree to allow each other to mention the other Party in connection with speaking engagements, Web sites, client proposals and other communications sent by the Party to existing and potential customers and others indicating the relationship of the two Parties. Pedigree may document a business case for the deployed solution and seek the other Party's review prior to release. Pedigree may list the other Party's logo on its website and other promotional material where applicable. Pedigree may distribute a press release announcing the contract execution between Pedigree and the other Party. However, prior review and consent must be obtained from the other Party for any press releases pertaining to this Agreement or the Parties' relationship with each other. The consent will not be unreasonably withheld or delayed, if so, either Party has the right to release such information without consent.

11.8 Precedence **Over Purchase Order Terms and Conditions.**  Any additional or different terms contained in Client's purchase order, whether or not such terms materially alter this Agreement, shall be deemed objected to by Pedigree and of no force or effect unless the parties expressly amend this Agreement in writing.  Execution of a Client's purchase order shall not operate as an amendment to this Agreement.  Whenever printed, typed, stamped or written provisions of Client's purchase order conflict with this Agreement, this Agreement shall control.

11.9 Waivers **of Default.**  Waiver by either Party of any breach or default by the other Party shall not be deemed a continuing waiver of such breach or Default or a waiver of any other breach or Default.

11.10 Survival**.**  The terms and conditions contained in sections 2, 4, 7.4, 8, 9, 10 and 11 this Agreement survive the performance hereof by either or both parties hereunder.

11.11 Headings**.**  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

11.12 Governing **Law**. This Agreement will be governed by and interpreted in accordance with the laws of the State of North Dakota, without regard to conflicts of law principles thereof or to the United Nations Convention on the International Sale of Goods.  For purposes of all claims brought under this agreement, each of the parties hereby irrevocably submits to the exclusive jurisdiction of the state courts of the State of North Dakota located in Cass County and the United States District Court for North Dakota located in Fargo, North Dakota.

11.13   **Entire Agreement**. The Master Agreement comprised of this T&C, the OneView Contract Agreement and any addenda, amendments or supplements thereto entered into by and between the Parties from time to time will constitute the entire Agreement between Client and Pedigree with respect to its subject matter and supersedes all proposals, oral or written, all negotiations, conversations, or discussions between or among Parties relating to the subject matter of this Agreement. No changes, modifications or waivers may be made to this Agreement unless evidenced in writing and signed for and on behalf of both Parties.

11.14 Severability**.**  If any of the provisions of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render unenforceable the entirety of this Agreement, but rather, unless a failure of consideration would result therefrom, the entirety of this Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions, and the rights and obligations of Pedigree and Client shall be construed and enforced accordingly.

Client Initials _DR_